## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFF COON, individually and on behalf of all others similarly situated,<br><br>                     Plaintiff,<br><br>     v.<br><br>ATERIAN, INC., YANIV SARIG, and FABRICE HAMAIDE,<br><br>                  Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>Jury Trial Demanded |

Plaintiff Jeff Coon ("Plaintiff"), by and through his attorneys, alleges upon personal knowledge as to his own acts, and upon information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), news reports, press releases issued by Defendants, and other publicly available documents, as follows:

### NATURE AND SUMMARY OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Aterian, Inc. (formerly known as Mohawk Group Holdings, Inc. ("Aterian" or the "Company") securities between December 1, 2020 and May 3, 2021, inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      Aterian purports to be a "technology-enabled consumer products platform that builds, acquires and partners with e-commerce brands. The Company's proprietary software and

1

highly agile supply chain helps creating for a growing base of data empowered e-commerce customers. Aterian predominantly operates through online retail channels such as Amazon and Walmart, Inc."

3.     Through April 29, 2021, the Company was known as Mohawk Group Holdings, Inc., and its shares traded on the NASDAQ stock exchange under the ticker symbol "MWK." Effective April 30, 2021, the Company changed its name to Aterian, and its shares began trading under the ticker symbol "ATER" on the NASDAQ stock exchange.   The Company is headquartered in New York, New York.

4.     On December 1, 2020, the Company announced that it had acquired the assets of "leading e-commerce business brands Mueller, Pursteam, Pohl and Schmitt, and Spiralizer" from 9830 Macarthur LLC, ZN Direct LLC, and Reliance Equities Group, LLC.  On this news, shares jumped from their December 1, 2020 close of $6.89 per share to a December 2, 2020 close of $8.12, representing a one-day surge of nearly 18%.  Shares continued to soar, closing at $17.21 per share on December 31, 2020, and eventually approaching nearly $49.00 per share in mid-February 2021.

5.     On May 4, 2021, analyst Culper Research published a scathing report entitled: "Aterian (ATER): Bought from Felons & Fraudsters, Sold to You."  In this report, Culper wrote that "the Company has ties to convicted criminals and is promoting what we believe is an overhyped 'AI' narrative and a string of garbage acquisitions to mask the failure of its already ill-conceived core business."  Culper continued that "Aterian has been largely unsuccessful in convincing other Amazon sellers to pay for its 'AIMEE' AI platform, and at least 5 former employees and a former customer have expressed doubts regarding AIMEE's legitimacy. We think that Aterian's

underlying business has failed, forcing the Company to obscure its poor performance with a series of questionable acquisitions."

6.     Culper further wrote: "[w]e believe that there are serious problems with Aterian's claims to maintain strong organic growth and to drive M&A synergies: to us, neither of these appears to be the case. . . . In our view, this suggests not only that Aterian is unable to growth EBITDA at acquired businesses, but that its core business is also failing to produce."

7.     On this news, the price of Aterian stock fell from its May 3, 2021 close of $20.66 to a May 5, 2021 close of $15.72 per share, a two-day drop of $4.94 per share or approximately 24%.

8.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's organic growth is plummeting; (ii) the Company's recent, self-lauded acquisitions were overpayments for flawed assets from questionable sources; (iii) Aterian's purported artificial intelligence software is a flawed product that lacks customer interest; (iv) Aterian uses rebate programs and paid or artificial reviews to pump up their product offerings; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

## JURISDICTION AND VENUE

9.     The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company's principal executive officers are located within this District, the Company's securities trade on the NASDAQ stock exchange, which is located within this District, and because the Company conducts substantial business here.

13.     In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14.     Plaintiff Jeff Coon acquired and held shares of Aterian at artificially inflated prices during the class period, and has been damaged by the revelation of the Company's material misrepresentations and material omissions.

15.     Defendant Aterian purports to be a "technology-enabled consumer products platform that builds, acquires and partners with e-commerce brands. The Company's proprietary software and highly agile supply chain helps creating for a growing base of data empowered e-commerce customers. Aterian predominantly operates through online retail channels such as Amazon and Walmart, Inc." Aterian shares trade on the NASDAQ stock exchange under the ticker "ATER." The Company's headquarters are located at 37 East 18th Street, 7th Floor, New York NY 10003. Aterian is incorporated under the laws of the State of Delaware.

16.     Defendant Yaniv Sarig is a co-founder of Mohawk Group, Inc. and has served as the director, President, and Chief Executive Officer of Aterian since September 2018.

17.     Defendant Fabrice Hamaide was the Company's Chief Financial Officer into March 2021, at which time he became the Company's Head of Mergers and Acquisitions in the European Union.  Defendant Hamaide ceased serving as CFO and resigned from the Company's Board of Directors on March 8, 2021.

18.     Collectively, Defendants Sarig, and Hamaide are referred to throughout this complaint as the "Individual Defendants."

19.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market.  The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected.  Because of their position with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

20.     Aterian was incorporated under Delaware law in March 2018 under the name Mohawk Group Holdings, Inc.   The Company's proprietary technology platform, known as

"AIMEE," purportedly "allows [Aterian] to identify product and market opportunities and to execute and manage online marketing strategies."

21.     On April 29, 2021, the Company announced that effective 12:01 a.m. Eastern on April 30, 2021, the Company would be rebranded from Mohawk Group Holdings, Inc. to Aterian, and that its shares would cease trading as MWK and would begin trading as ATER, all on the NASDAQ stock exchange.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

22.     The Class Period begins on December 1, 2020, the Company issued a press release entitled "Mohawk Group Furthers Execution of M&A Strategy Announcing Accretive Acquisition of Mueller, Pursteam, Pohl and Schmitt and Spiralizer E-Commerce Brands."  In this release, Defendant Sarig stated:

> We are excited to announce this acquisition, which we are confident will achieve key strategic, financial and growth objectives for Mohawk and furthers our goal of building the consumer product platform of the future. By acquiring the assets of these four strong brands, we are demonstrating how our M&A strategy can be a powerful factor in our growth and profitability going forward. The 43 new products we are adding to our portfolio are mainly part of the home and kitchen small appliances category and will expand our existing large appliance product portfolio. In the last twelve months, private equity and venture capital backed companies have raised significant funding to fuel the acquisition of Amazon brands and we believe our technology platform and agile supply chain position Mohawk to be a leader in this space moving forward.

23.     In this release, the Company also announced that it was increasing its expected net revenue for full year 2020 to the range of $180 to $190 million, up from $175 to $185 million, "reflecting the addition of the" acquisitions.  The Company also announced expected net revenue for full year 2021 to be in the range of $290 to $320 million.

24.     On December 2, 2020, the Company held a conference call with analysts to discuss its acquisition of Mueller, Pursteam, Pohl and Schmitt, and Spiralizer. On this call, Defendant Sarig stated:

> We acquired leading e-commerce business brands Mueller, Pursteam, Pohl and Schmitt, and Spiralizer. Those brands collectively add 43 new products to our portfolio, mainly home and kitchen small appliances, which will supplement our large existing appliance product portfolio under the existing Vremi and hOmeLabs brands.
>
> Our M&A strategy is to acquire online product listings, brand IP, its inventory, and its manufacture relationships. Under this model, we generally do not see meaningful increase in fixed cost as we rely on our platform aiming to assist our existing team with managing the online listings going forward.
>
> The addition of these brands will be accretive to our earnings and furthers our goal of building the consumer platform of the future. We expect to see exciting growth as we launch more products on both the new brands and our already existing brands, as well as through expansion of international markets and additional domestic channels.
>
> We believe that the e-commerce industry is at the beginning of a consolidation movement, and we want to be at the forefront of that movement. There are many Amazon sellers today who have built incredibly successful consumer brands that are prime targets for our M&A strategy. We believe that we can continue to acquire certain targets at accretive multiples. And thanks to our economies of scale, technology, and supply chain platform, we believe we would be able to efficiently manage and scale those existing online brands as we did with Truweo and as we're beginning to do with these new brands.

25.     Defendant Sarig continued that "the approach that we're taking as we just discussed is very data-driven, right? When we looked at the portfolio of these brands, we very selectively chose the products that we wanted to take and left parts that we do not think would meet our expectations from a data perspective behind, right? So the acquisition is really very kind of surgical and selective around what the data shows us of products that we believe we can

continue to maintain at a very high, as you mentioned, like positioning in their category and that we can continue to expand to international markets and other channels."

26.    On this same call, an analyst from Alliance Global Partners asked "in terms of EBITDA in 2021, how do we think about the influx of new products as well as, [Defendant Sarig], you just mentioned talking about international opportunities for the products that you're taking on."  Defendant Sarig responded:

> [O]f course, we're adding significant amount of EBITDA with this acquisition, right? That said, we will actually invest more both because of new product launches that was already factored in.
>
> But with the international expansion, we'll have a little bit of upfront fixed cost investments to establish ourselves correctly in each of the countries where we're going; so that may weigh a little bit. I mean, that's one of the advantages of being very profitable and cash flow positive is to be able to roughly time the investments that you want more accurately. So it's still going to be a very significant addition to EBITDA overall. But a little bit of it will be reinvested for accelerating growth as well.

27.    On this same call, an analyst from ROTH Capital Partners asked: "you made a few comments on the cadence of product launches perhaps being a bit heavier in Q1, Q2 next year. I guess I was a little surprised to hear that just given inventory position at the moment, but maybe you could talk a little bit about how you feel about rebuild of inventory, I think, in the early part of next year? Any change of expectations on that?"  Defendant Hamaide responded:

> Well, actually, as you know, I mean first inventory shorts are more tight to our sustained SKUs than our launch SKUs, that's one. And, actually, it's also one of the reasons why we did not accelerate further in Q4 the new products. Remember that we actually acted on the fact that we're going to reaccelerate post kind of COVID and lack of normalization of the data, and we actually had a very strong pipeline with products ready to go. But because of the manufacturing cycles being extended, some products that normally could have launched in Q4 are not, right? So that's the way you tie it all together.

We're still going to -- as discussed, are suffering a little bit of inventory shorts all the way through Chinese New Year, so it's going to be all the way through end of January. And then in February, essentially the manufacturing is going to be shut down. But we'll have -- we're taking those manufacturing cycles into consideration. All of the product launches that I'm talking about have had a -- have been, in some form, not all of them, but some of them, impacted by those manufacturing cycles. And that's the reason why the rate is high on new launches in Q1 already.

28.     An analyst from D.A. Davidson asked: "I think it was this year when you turned the quarter on becoming, at least by appearances, sustainable EBITDA positive. Can we confirm that you still believe that you have turned that corner and anticipate sustaining EBITDA positive?"   Defendant Hamaide responded: "[o]bviously, right, I mean, that's very obvious especially with the addition of [Smash], right? So it's actually going to be a significant acceleration to our EBITDA for 2021."

29.     On this same December 2, 2020 call, Defendant Hamaide stated:

[E]ach company, and I'm going to speak to Mohawk, have their particular strength. But in the case of Mohawk, of course, is because of the strength of our platform, we can actually make some products that would be not as profitable, very profitable in some cases, and therefore interesting to us on the M&A side, can scale those brands on the markets where their technology platform is connected better, and can actually potentially incentivize sellers to keep on launching and innovating new products, capitalizing on the fact that now they don't have to actually bother with managing sustained SKUs, right?

So I think that everybody has a small angle. And for the moment, I don't see a significant pressure on the multiples.

But that said, again, one of the key differentiators of Mohawk is, yes, we have that M&A strategy element which is very, very important because we have the platform and therefore it scales extremely well for us. And as Yaniv mentioned, it adds very little fixed cost to our structure, if any, depending on the transaction size.

But we also have our own new products launches that we actually are organized for, which first creates us -- creates an independence from any potential increase in EBITDA multiples, but also allows

us to actually expand faster some of the brands that we acquire by launching new products on top of those existing ones.

30. Last, on this December 2, 2020 call, Defendant Sarig stated:

As we mentioned, we look at products on a per product basis and analyze their strength in the category. The teams that have built these brands and products have done a really great job at sourcing high quality products at a great price, analyzing the market really well, and most importantly bringing them with the right timing to market and building a moat for them, right?

The products are, in the home and small appliance category, very strongly entrenched a lot of great social proof from customers and continue its history of good sales, which make them again strongly anchored in the category. And that's what we love to see, right? We love to see products that have moat that is very hard to go against, right? And our goal is to continue to maintain that moat and continue to benefit from the growth of e-commerce in general plus expand the products to our channels where they're not yet showing up on especially international and other domestic channels in the U.S., right? So that's really kind of the approach we take there.

On top of it, [this] complementary, there's very little overlap with our existing portfolio. We're already very strong in the kind of bigger appliances, and this kind of like completes almost our position in the categories of small to large appliances. Again, a very strong portfolio across the board. So that's how we think about it.

And then, in general, there is always the ability through the data to see when you have strong products, what other products that people buy in conjunction with these products. What can we build -- how can we build new products around those existing assets that we acquired to strengthen the brand even further, right? So that's how we look at it and that's how we choose the products based on the data, and that's where we're excited about the ones that we selected here.

*       *       *

[I]t goes back to I think what is happening in this industry, right? You have, over the last few years, many successful smart entrepreneurs who build good e-commerce brands and have really benefited from being at the right place at the right time, did a great job at building the brand, launching it. And oftentimes what happens is they reach a certain scale where because they haven't invested in infrastructure, because they haven't invested in

building a platform that allows them to create some operating leverage, they're at a place where it's tough for them to continue to scale, and they are looking for -- they're looking to sell, right? And it's interesting to understand I think for a lot of people that these entrepreneurs are very smart, again, very, very capable and have really been super successful at leveraging what e-commerce offers them.

But as you scale to the numbers of the brands that we're acquiring here, you're starting to hit an issue where it just takes too many people to manage their product. It takes too many people to add additional products, right? And that's where again if you haven't done the investment that we've done initially in a platform both on technology and supply chain, the financial engineering, you're starting to find yourself in a position where either you try to do that now or you try to sell yourself. And that's where a lot of those FBA sellers are today, and that's why there is such excitement I think in the industry around building companies that are building the infrastructure to be able to manage a lot of the brands beyond where they would hit kind of like a ceiling on their own, right?

31.     On February 2, 2021, the Company announced that it had acquired the assets of e-commerce company Healing Solutions, LLC, "a leading online seller of essential oils," for $15.3 million in cash and the issuance of approximately 1.4 million shares of Company stock.  Of this acquisition, Defendant Sarig stated:

> Our mission to build the leading e-commerce consumer brands platform has taken another meaningful step forward today. We are thrilled to enter the essential oils category which further diversifies our e-commerce portfolio of brands. Consumable products with recurring purchases and subscription revenue opportunities that complement our hard goods brands have been on our radar. Our strategy to create a supply chain and technology platform designed to operate e-commerce brands across a wide spectrum of categories at scale continues to bear fruit. We are still at the early stages of executing on our ambitious goals and are looking forward to developing new products for the brands we are acquiring as well as extending their reach internationally.

32.     In this same February 2, 2021 announcement, the Company increased its expected net revenue for the full year 2021 to a range of $340 to $370 million, up from $290 to $320 million, which purportedly was "reflecting the addition of the Healing Solutions business."  In

addition, "[t]he Company is establishing a net income estimate for the year ended December 31, 2021, which it expects to be in a range of $1 million to $5 million due primarily to quarterly interest expense, net and stock-based compensation expense. The Company is also establishing an Adjusted EBITDA estimate for the year ended December 31, 2021, which it expects to be in the range of $28 to $32 million."

33.     Also on February 2, 2021, the Company held a conference call with analysts to discuss the Healing Solutions acquisition.  On this call, Defendant Sarig stated:

> I'm excited to announce that today, we closed another significant premium acquisition that furthers our M&A strategy and continues to accelerate our growth. We acquired a leading essential oils and wellness e-ecommerce brand, Healing Solutions, which adds over 3,000 new essential oils products to our portfolio. Healing Solutions' trailing 12-month revenue and operating income excluding inventory liquidations as of October 31, 2020, were approximately 65.2 million and 12.7 million respectively.

> Our M&A strategy consists of primarily of acquiring the assets of all non-e-commerce brands, including their product listings, trademarks, inventory, manufacturing relationships. Under this model, we generally don't add any meaningful increase in fixed costs and we rely on the strength of our technology and supply chain automation platform, (AMY), to assist our existing team in driving value for the online listings going forward.

> The addition of Healing Solutions will be highly accretive to our earnings and furthers our goal of building the consumer product platform of the future. I'm very happy to see us entering the consumables category with its repeat purchases and subscription revenues. We have interesting opportunities to cross sell and to promote the Healing Solutions product with our existing hardware products with products like humidifiers and diffusers.

> Our core strength continues to be our ability to launch new products and we intend to launch more products under the Healing Solutions brand. In addition, we also intend to expand this business to international markets and to additional domestic accounts.

> The e-commerce product industry is in the early stages of a consolidation movement and we are the forefront of that movement. There are many Amazon sellers today who have built incredibly

successful small consumer brands that are prime targets for M&A strategy. We remain confident that we can continue to acquire high quality targets at accretive multiples and that thanks to our economies of scale created by our tech, our supply chain platform, we can efficiently manage those existing online brands as we did with the other recent acquisitions.

Today, we also announced an incremental debt financing in the form of a new Senior Secured Note. The aggregate face amount is $16.5 million and has a two-year bullet maturity. This financing allows us to maintain a strong balance sheet while continuing to execute on our M&A strategy.

With this acquisition, we've increased our full year 2021 guidance from 340 million to 370 million from 290 million to 320 million. We're also unveiling our 2021 adjusted EBIT targets. We expect adjusted EBITDA for full year 2021 to be in the range of 28 million to 32 million.

34.    Defendant Sarig further stated on this call:

[I]t's interesting from the perspective of the marketing and the management of the forward e-commerce part, on Amazon, part of the entire strategy is that there's a certain kind of like algorithm, if you will, to managing products online. And from our platform perspective, whether the products are essential oils, or humidifiers, or air dryers for that matter, it doesn't matter as much, right?

If the data shows strength and the ability to manage the products very efficiently going forward, that's the power of what we've built, is that we took the common denominator of managing this type of consumer products online and optimized it as well as possible for our platform.

When it comes to the supply chain, there's definitely some interesting moving parts here of this company is actually running its own bottling operation here in the U.S. And we've structured the deal in a way where we haven't bought the manufacturing or bottling operation. But we have aligned interest with that group of obviously as they're taking some of the sell here of the brand in equity at Mohawk.

And we have a plan with them to further improve that operation, which we hope can result in even further margin expansion as we potentially improve that piece of the public business. So other than the supply chain itself with the bottling operation in the United States, really, again, it's what the strategy is all about. If the data

shows us that in a particular category, a set of consumer product is well entrenched and that we can manage it through our platform, the category, it doesn't matter as much. And that's the power of what we've built.

*    *    *

And we're focusing today really on category leaders. We're really prioritizing companies that have built a moat and have a very strong position in the category that we can continue to defend and see grow kind of with the pace of the growth of e-commerce.

So when it comes to the United States, we expect to see healthy growth here, but not necessarily trying to make this a rocket. It's already doing quite well.

Where there is a significant growth in our opinion is potentially over time as we continue to expand internationally, deploying this portfolio of brands and products to Europe and to other countries is going to be an exciting source of growth for the brand, as well as launching more products. We've continued to use data in our platform and our agile supply chain to find opportunities within the category and within cost categories where it makes sense to add more products to the brand. And we'll see that here as well.

35.     On this call, an analyst from Alliance Global Partners asked "then when you look at the category on Amazon, are you able to quantify what percentage of the category Health Solutions owns?"  Defendant Sarig responded:

It's a fluid number, but it's really one of the top brands in the category. There are a couple of others. Overall, what I like to see is really the stability. There's been – Healing Solutions has been in this category for many years now and has kind of kept a very stable control of the market share that they own. They started this in 2014 and, again, have grown to be category leader, it's really difficult to enter at this point between them and a couple of other brands that are strong in the categories.

It's almost like there's already a status quo there. And that's what attracted us to this. If you remember our approach is use data, find opportunities in categories that are disruptable. And when they're not, look for the opportunity to potentially acquire one of the leading brands. And that's exactly what happened here.

36.     Defendant Sarig also said on this February 2, 2021 call:

14

I mean most of these companies have built themselves meaningful cash flows, call them almost lifestyle businesses. But just like Healing Solutions and the other ones that we've acquired, they've done a phenomenal job. They've really built great brands that resonate with consumers and show metrics that are exceptional.

And so for us, it was continuing to use data to pick and do the diligence on these brands and make sure that we select the right ones. But again, we're talking about a very, very large market that's continuously evolving with new players coming in. So I really see our opportunity to continue to acquire these companies be very, very large and also international as well. We haven't yet started to look at companies internationally, but those exist, too.

\*       \*       \*

One of the one of the things that might go a little bit unnoticed in these remarks are the amount of products that we're adding here. We're adding 3,000 products immediately to our set. And again, we're excited about that.

Part of the automation that we're building and our ability to automatically forecast, automatically manage things like PPC and pricing are going to be extremely important here. Again, the whole premise of the investment in technology and machine learning and automation is that as we acquire or build more of these products and our portfolio becomes larger and larger, we can continue to empower our team with automation tools, machine learning and data sets that are going to allow them to just be a lot more effective.

If we hadn't made that investment, obviously, the fixed costs that we would have to kind of incur with every one of these acquisitions would skyrocket, because you need a lot of people to manage these products. Our entire goal of our investment in machine learning is to turn our employees into superheroes to give them the ability to go and manage an exponential amount of more products than they would have to if they had to do it manually.

And this is a great example where we're adding all these products. And we're feeling confident in our ability to manage and very well going forward and continue to add more products. That's really again, where we will see over time, as we continue to expand, as we've seen already in the past, our headcount has been quite flat, although our revenue has increased dramatically, that ratio is what the investment in technology is all about.

\*       \*       \*

15

And that's exactly the case for Healing Solutions. The data showed us that they are very strongly anchored in the category and will continue to be and it was a great opportunity to use our M&A engine to add that to our portfolio.

The category is stable, as I said, has been stable for a long time, large demand. And that's what attracted us to this particular deal. When it comes to consumables, again, I think we've been very focused on hardgoods in the last few years. And adding consumables is really exciting, especially as I mentioned earlier on cross selling.

So you, you look at our portfolio today across the brands that we build or acquire and you see many products that can be great additions to an essential oil or vice versa, an essential oil could be a great addition to that product. And so you can imagine how we could cross sell, for example, a humidifier or a diffuser with basically putting offers in the package to send people back to, for example, join a subscribe and save program on the essential oils or try promotion for trying this product for the first time. So hopefully bring in that that kind of like recurring purchase habit like for those consumers who love the product.

So there's going to be a lot of synergies, I think between those. And in general, we're going to continue to look for more consumable opportunities. I can't guarantee how many we're going to do and at what percentage that's going to represent throughout our portfolio. But diversification is one of the core strengths of the platform play.

Again, going back to this idea that we took the common denominator of managing these type of businesses online and we systematized and made as efficient as possible, that's what allows us to then now manage across the different categories and cross sell across the different categories without necessarily creating the limitations.

37.     On March 8, 2021, the Company reported its fourth quarter and full year 2020 financial results. The Company stated that full year net revenue grew 62.3% year-over-year to $185.7 million, compared to $114.5 million for 2019, and the Company further stated that gross margins and operating losses both improved. In this announcement, Defendant Sarig stated:

I am proud of our team for delivering a strong Q4 and for our full year results. Looking ahead in 2021, we expect to continue the

momentum following our Healing Solutions acquisition as we continue to accelerate our accretive M&A strategy. We are currently evaluating a strong pipeline of potential M&A targets that in total have trailing twelve month's net revenue of $522 million and trailing twelve month's EBITDA of $97 million. I am also excited to announce that our CFO, Fabrice Hamaide, is changing roles effective immediately to become our General Manager and Head of Corporate Development, Europe, and Arturo Rodriguez is being promoted from SVP, Finance to become our new Chief Financial Officer. We are thrilled about the opportunities in Europe for potential expansion of our existing products and the many potential acquisition opportunities of e-commerce brands abroad. Fabrice has already secured a binding term sheet for our first proposed European acquisition, Photo Paper Direct. Photo Paper Direct is an established UK based e-commerce brand in the Printing Supplies Category with a long history of Amazon success in Europe.

38.     The statements described above were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. As discussed below, the Defendants misled investors by misrepresenting and/or failing to disclose that: (i) the Company's organic growth is plummeting; (ii) the Company's recent, self-lauded acquisitions were overpayments for flawed assets from questionable sources; (iii) Aterian's purported artificial intelligence software is a flawed product that lacks customer interest; (iv) Aterian uses rebate programs and paid or artificial reviews to pump up their product offerings; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

39.     The statements described in ¶¶ 22-37 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.

## THE TRUTH EMERGES

40.     On May 4, 2021, analyst Culper Research released a scathing report on the Company, entitled: "Aterian (ATER): Bought from Felons & Fraudsters, Sold to You." Culper wrote that Aterian "has ties to convicted criminals and is promoting what we believe is an

overhyped 'AI' narrative and a string of garbage acquisitions to mask the failure of its already ill-conceived core business. Over 25% of Aterian shares now belong to two felons and two alleged scam artists, all of whom will be free to dump their stock by August."

41.    The Culper report continued that "Aterian's CEO [Defendant] Sarig holds himself out as a visionary, yet he appears to us more of a bit hustler. Just prior to his becoming CEO at Aterian, Sarig participated in the failed Reg A+ IPO attempt of Bitzumi, a cryptocurrency business co-founded by widely derided crypto promoted James Altucher. We understand that Aterian has been largely unsuccessful in convincing other Amazon sellers to pay for its 'AIMEE' AI platform, and at least 5 former employees and a former customer have expressed doubts regarding AIMEE's legitimacy. We think that Aterian's underlying business has failed, forcing the Company to obscure its poor performance with a series of questionable acquisitions."

42.    Of Aterian's February 2021 acquisition of Healing Solutions, Culper wrote:

> In February 2021, Aterian purchased Healing Solutions from Jason R. Hope, otherwise known as "the real party king of Scottsdale". Hope previously ran an alleged text messaging scam called JAWA, which was sued by both Verizon and the Texas State Attorney General. Aterian has now pitched Healing Solutions as a "recurring revenue" essential oils business, but we think this is highly deceiving: the company's revenue growth came from hand sanitizer sales starting in June 2020. Our analysis of import records suggests that Healing Solutions generated $40.2 million – or 62% of its total trailing-twelve-month revenues – from hand sanitizers, while it appears to have taken its final hand sanitizer shipment on August 31, 2020. We think this COVID-driven business is never coming back. We calculate that alleged scam artist Jason Hope owns nearly 5.0% of the Company, and his lock-up expires on August 2, 2021.

43.    Of Aterian's December 2020 acquisition of the Mueller, Pursteam, Pohl and Schmitt, and Spiralizer e-commerce brands, Culper wrote:

> In December 2020, Aterian purchased 9380 Macarthur LLC ("the Smash Assets") from convicted felon Mikial Nijjar ("Nijor"), who also appears to be late on $4.1 million of taxes to the State of

California. Not only has Aterian has not disclosed that its largest acquisition was from a felon who served prison time, but despite 5 elapsed months, the Company has failed to provide audited financials for the Smash Assets, leaving its S-3 shelf filing ineligible. The lock-up on Nijor's massive 16.2% stake expires in June 2021.

44.    Culper continued:

We believe that there are serious problems with Aterian's claims to maintain strong organic growth and to drive M&A synergies: to us, neither of these appears to be the case. We estimate that even with zero YoY growth, Aterian's acquisitions should be contributing $34 million of EBITDA in 2021, against a Company-wide midpoint guide of just $32 million. In our view, this suggests not only that Aterian is unable to grow EBITDA at acquired businesses, but that its core business is also failing to produce. We estimate the Company's own 2021 revenue guidance implies just 16% organic growth, both a massive year-over-year deceleration, and a departure from claims to maintain consistent growth in the core business. We think this stems from Aterian's wildly oversold claims of its AI platform, AIMEE:

     - AIMEE has been in "pilot programs" with third-party customers since 2018, yet revenues remain miniscule and decreased from 2019 to 2020. One former customer stated of the Company's claims of its abilities that, "there's maybe one-third of the data that they actually had" and "we were just like a little oversold."

     - Former employees characterize AIMEE as "very simple" and questioned "how much of this is AI, and how much of this is 3 or 4 very smart people with Monster Energy drinks using a computer."

     - Aterian intends for each product launch to move into the "sustain" phase, characterized by 10% margins, then the "milk" phase, where pricing power yields increased profitability. Yet despite claims that the AI improves over time, Aterian has launched 69 products since Q1 2019, and not a single one has successfully reached the "milk" phase. Moreover, the Company's own Form 10-K filed in March 2021 disclosed a "lower than expected success rate of products reaching the sustain phase" indicating what appears to be a trend of worsening results on the Company's product launches.

45.    The Culper report further provided:

We believe Aterian's backbone is not AI, but a smattering of "gray area" tactics of the type that have regularly gotten sellers booted from Amazon. For example, the Company's Vremi brand currently advertises 60% to 100% off rebates on ice makers, and Aterian also runs Facebook groups such as the "Secret Deal Explorers", which offer free or highly discounted product in exchange for reviews. Relying on these pay-to-play reviews is not only a far cry from Aterian's claims that "artificial intelligence" drives successful product launches, but suggests an unstable and existentially risky business model. Per a former employee, "If you had gotten to 2,000 reviews or something, Amazon would wipe out 1,900 reviews ... It happened so many times—Amazon would come back and just shut down your listing. There were weeks when we lost half our revenue."

In Aterian's apparent quest to show revenue growth at any cost, the Company has not only given massive slugs of equity away to felons and alleged scammers, but has piled on expensive debt at an effective interest rate of nearly 12%. Current and former insiders have been dumping. CEO Yaniv Sarig owned 891,551 shares at the Company's IPO, yet owns just 250,894 today. CFO Fabrice Hamaide resigned in March 2021 (hence relieving him of the duty of signing the financial statements) and his shareholdings have also fallen from 711,383 at IPO to just 272,605 today. We count at least 4 additional executives who set up Rule 10b5-1 sale plans in December 2021, which have allowed them to dump further holdings through at least March 2021. At the same time, ATER total share count has ballooned from 17.8 million to 30.6 million within the past year as a result of the Company's ruthless dilution.

Aterian uses promoters including Michael McCarthy of the DreamTeam, who settled with the SEC in 2017 following a string of undisclosed compensation for promotional blog posts. Aterian also has ties to several other unsavory and second-rate outfits, including Katalyst Securities (Michael Silverman & Adam Gottbetter), Ladenburg Thalman, and Alliance Global Partners.

46.    Culper further wrote "[w]e think Aterian turned to acquiring garbage as its core promotion has failed."  First, Culper discussed Aterian's acquisition of Healing Solutions: "[w]e believe Aterian misrepresents this acquisition as a 'recurring revenues' essential oils business rather than what it actually is: a re-seller of Chinese hand sanitizers whose revenues likely peaked last summer and are never coming back. Alleged fraudster Hope himself even said 'the terms we

got from Aterian were far superior to other offers . . . .' confirming our view that Aterian has been taken for a ride." However, as Culper noted, "conspicuously missing" from Aterian's public disclosures "are any reference to what in our view is the major driver of Healing Solutions' so-called 'recurring' business over the past year – hand sanitizers. . . . [W]e estimate that Healing Solutions imported hand sanitizer [from China] worth $40.2 million, or 62% of total trailing-twelve-month revenues. . . . To us, the business of flipping Chinese hand sanitizers is a far cry from a 'recurring revenue' essential oils business . . . ." Culper noted: "import records also show that Healing Solutions took delivery of its last hand sanitizer shipment on August 31, 2020, suggesting to us that this business has peaked and is never coming back." (Emphasis omitted).

47.    Next, Culper discussed Aterian's acquisition of the Mueller, Pursteam, Pohl and Schmitt, and Spiralizer e-commerce brands. "Aterian claimed" that these assets "generated $77.5 million in revenues and $13.1 million in operating income for the last twelve months, yet even 5 months post-acquisition, Aterian remains unable to file audited financials for the acquired business." Culper further raised serious questions as to who Aterian bought these assets from – which, as a result of the share issuance associated with those acquisitions, now owns approximately 16.2% of Aterian – the Company's largest shareholder. Culper alleged that "SEC filings indicate" that this individual is Mikial Nijjar, who the DOJ charged in August 2012 with applying for a passport using another person's name, and who was sentenced to 4.5 months in prison. Culper wrote that Nijjar's "6-month lock-up expires on June 1, 2021."

48.    Culper further asserted that "Aterian isn't an artificial intelligence company; it's a reseller of cheap Chinese goods." Culper wrote that "[n]umerous former employees corroborate our view." One former technology executive at the Company stated: "[s]o the reality is, when I was there, it was not, even though it was called an AI engine, it was not. That's the truth. Even

though we applied natural language processing in some places and sentiment analysis, it just wasn't where the full vision wanted it to be, and so it was a lot of automation and, like you said, rules processing versus actual AI . . . ."  A former business development executive at Aterian said, per Culper, that "[t]here's a lot of wild-goose chases with the management. And there's definitely some grey area actions in terms of like how we make things successful, which are totally above board, but they're grey in the sense that how scalable are these things, how much of this is AI, and how much of this is 3 or 4 very smart people with Monster Energy drinks using a computer."

49.    Culper further alleged that "Aterian promotes AI, but hides its Facebook groups and rebate programs. Aterian claims its backbone is its AI. However, Aterian appears to hide underhanded, 'gray area' tactics such as paid reviews. We believe these hacks are what truly drive Aterian's product 'discovery', and understand that Aterian frequently toes the line of Amazon's terms."  Culper quoted a former Aterian brand manager who said "when I was first there, you were allowed to give someone a product for free and then they can leave a review. And that counts as a verified purchase . . . ."  The same former brand manager said, per Culper, "the truth is, they would find any product and they would just put it up. And then if it didn't work, they would use reviews, like get people to write reviews."  A former business development executive at the Company said, per Culper, "[i]t's something that requires a lot of human ingenuity, to require sort of grey hat marketing moves, things like a lot of brands, speaking broadly, have publicly available Facebook groups, where they can promote their products and offer rebates on their products. . . ."  Culper concluded this section of its report by writing that "[w]hile Aterian continually trumpets the narrative that it is AI-driven, we find that the Company has implemented these more underhanded tactics while shielding them from Investors' view."

50.    On this news, the price of Aterian stock fell from its May 3, 2021 close of $20.66 to a May 5, 2021 close of $15.72 per share, a two-day drop of $4.94 per share or approximately 24%.

## CLASS ACTION ALLEGATIONS

51.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Aterian securities between December 1, 2020 and May 3, 2021, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

52.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

53.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a.  Whether Defendants violated the Exchange Act;

    b.  Whether Defendants omitted and/or misrepresented material facts;

    c.  Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

    d.  Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

    e.  Whether the price of the Company's securities was artificially inflated; and

    f.  The extent of damage sustained by Class members and the appropriate measure of damages.

54.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

55.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

56.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FRAUD ON THE MARKET

57.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. The omissions and misrepresentations were material;

c. The Company's securities traded in efficient markets;

d. The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

e. Plaintiff and other members of the class purchased the Company's securities between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

58.    At all relevant times, the markets for the Company's securities were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services.

Plaintiff and the Class relied on the price of the Company's securities, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

59.    The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint.  The specific statements pleaded herein were not identified as forward-looking statements when made.

60.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## LOSS CAUSATION

61.    On May 4, 2021, analyst Culper Research released its report as alleged herein. On this news, the price of Aterian stock fell from its May 3, 2021 close of $20.66 to a May 5, 2021 close of $15.72 per share, a two-day drop of $4.94 per share or approximately 24%.

### Count One
### Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

62.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

63.    During the Class Period, Defendant Aterian and the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

64.    Defendant Aterian and the Individual Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to

defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

65.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's securities. Plaintiff and the Class would not have purchased the Company's securities at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**Count Two**
**Violation of § 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

66.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

67.    The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents described above that contained statements alleged by Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

(b)     awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(c)     awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

(d)     awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated:  June 10, 2021                         Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Thomas H. Przybylowski
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
tprzybylowski@pomlaw.com

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**

Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

***Attorneys for Plaintiff***

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I, _____Jeff Coon_____, make this declaration

pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private

Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against Aterian, Inc. f/k/a Mohawk Group Holdings,

Inc. ("Aterian" or the "Company") and authorize the filing of a comparable complaint on my

behalf.

3.    I did not purchase or acquire Aterian securities at the direction of plaintiffs' counsel

or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who

purchased or otherwise acquired Aterian securities during the class period, including providing

testimony at deposition and trial, if necessary.  I understand that the Court has the authority to

select the most adequate lead plaintiff in this action.

5.    The attached sheet lists all of my transactions in Aterian securities during the Class

Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is

signed, I have not served or sought to serve as a representative party on behalf of a class under the

federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of

the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such

reasonable costs and expenses directly relating to the representation of the class as ordered or

approved by the Court.

8.    I declare under penalty of perjury that the foregoing is true and correct.


**Executed** <u>June 3, 2021</u>
          **(Date)**


_(Signature)_

<u>Jeff Coon</u>
          **(Type or Print Name)**

**Aterian, Inc. (ATER)**                                                                 **Coon, Jeff**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 2/19/2021 | 34 | $43.6600 |